**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISON**

| | | |
|---|---|---|
| JEFFREY BRIAN SCHMITT, | ) | CASE NO. 1:20-CV-01864-PAG |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | CARMEN E. HENDERSON |
| | ) | |
| Defendant, | ) | **REPORT & RECOMMENDATION** |
| | ) | |

## I. Introduction

Plaintiff, Jeffrey Brian Schmitt ("Schmitt" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Commissioner failed to follow the applicable procedural requirements in reaching its disability determination, it is RECOMMENDED that the Court REMAND the matter to the Commissioner for further proceedings.

## II. Procedural History

On November 9, 2016, Claimant filed an application for DIB, alleging a disability onset date of January 15, 2010. The application was denied initially and upon reconsideration, and Claimant requested a hearing before an administrative law judge ("ALJ"). On July 19, 2018, an ALJ held a hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified.  (ECF No. 12, PageID #: 96-134).  On September 27, 2018, the ALJ issued a

1

written decision finding Claimant was not disabled.  (ECF No. 12, PageID #: 74-95).  The Appeals

Council accepted review and issued its decision on June 28, 2020 affirming the ALJ's finding.

(ECF No. 12, Page ID #: 63-68).

On August 21, 2020, Claimant filed his Complaint to challenge the Commissioner's final

decision.  (ECF No. 1).  The parties have completed briefing in this case. (ECF Nos. 14, 17, and

18). Claimant asserts the following assignment of error:

> (1) The ALJ's RFC was not supported by substantial evidence as it
> did not adequately consider the totality of Schmitt's severe
> impairments prior to his date last insured, but after the date last
> insured used by the State Agency, and failed to accord
> controlling weight to the opinions of the treating physicians.

(ECF No. 14 at 1).

## III. Background

### A. Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Claimant's hearing:

> The claimant testified that he has a "bad back and bad knees"; that
> his right knee was replaced in January 2017, and that his left knee is
> currently pending planned replacement in November 2018.
>
> The claimant said that injections, physical therapy, and medication,
> as well as joint replacement, have neither alleviated his chronic pain
> nor improved the functioning of his lower extremities. As a result,
> he said, he sometimes requires the use of a cane for stability and
> assistance in standing and ambulation; even with this assistance,
> however, the claimant stated that he can stand for no more than 20
> minutes at a time.  When asked if he could maintain a job that
> required standing and walking for most of the workday, the claimant
> answered that such work was "not possible" for him to sustain due
> not only to his debilitating knee pain, but also due to the pain in his
> low back.  The claimant also reported having no more than 30 to 40
> percent use of his hands, due to the post-traumatic arthritis resulting
> from his 1984 fractures, with more recent revision surgeries and the
> additional onset of carpal tunnel syndrome.  He related that because
> of his hand limitations, he no longer moves furniture, vacuums, or
> picks up laundry.

2

According to his testimony, the claimant no longer walks the dog, collects arrowheads, paddleboats, water skis, goes on vacation, or regularly swims or attends concerts at Severance Hall, as his "gradual decline," including his gradually increasing affective distress/dysfunction and his gradually decreasing finances, has precluded his engagement in and/or his enjoyment of each of these activities.

The claimant said that he is "always" in pain, that he sleeps poorly, and that due to his pain and poor sleep, he is generally weak, tired, and irritable.  The claimant related that, through March 2017, he could not "get going" until about noon, at which time he may have picked up one of his daughters from work and/or attended a medical appointment. He would then return home and try to help with dinner, which was followed by watching television and trying to sleep.

(ECF No. 12, PageID #: 82-83).

Additionally, to ALJ received testimony from a vocational expert. The ALJ posed the following hypothetical:

Assume a hypothetical individual of the Claimant's age and education. Further assume this individual is limited to light work, with the following additional limitations. Frequent foot controls with the right; occasional ramps and stairs; no ladders, ropes, or scaffolds. The other posturals would be occasional balance, stoop, kneel, crouch, and crawl. Avoiding concentrated exposure to unprotected heights; moving, mechanical parts; operating a motor vehicle. Limited to simple, routine tasks, but not at a production rate pace.

**B.**  (ECF No. 12, PageID #: 128). In response, the vocational expert stated that such a person could perform jobs such as a routine clerk, mail clerk, and cleaner, housekeeper. (ECF No. 12, PageID #: 128). The ALJ's second hypothetical question reduced the exertional level to sedentary, and the vocational expert stated that such a person could perform jobs of addresser, weight tester, or parimutuel ticket checker. (ECF No. 12, PageID #: 128-130). Finally, the vocational expert testified that a person could be off task no more than 10% of a workday and absent no more than twice per month. (ECF No. 12, PageID #: 130).**Relevant Medical Evidence**

The ALJ also summarized Claimant's health records and symptoms:

The medical evidence confirms that, in November 2009, the

3

claimant's right knee showed x-ray evidence of "moderate degenerative changes involving the articular surfaces," along with chondrocalcinosis and evidence of a "previous ligament repair [and] mild to moderate narrowing the joint spaces, especially the lateral joint compartment and patellofemoral joint space" (Exhibit 17F).  In addition, on December 31, 2009, the claimant, who was "nearly 2 years out from a laparoscopic repair of a large right inguinal hernia," underwent a second hernia repair, with mesh (Exhibit 3F).

In January 2010, while still working on a landscaping/construction job, the claimant developed increasing left elbow pain, and on January 20, 2010, he saw orthopedic specialist John Dietrich, M.D. (Exhibit 4F).  Dr. Dietrich noted that while the claimant was "status post a previous olecranon fracture," examination of the claimant showed "no over deformity of his left elbow," which remained non-tender and demonstrated "no significant crepitus or locking" (Exhibit 4F).  An intra-office x-ray obtained at that time confirmed a "healing left radial head fracture," for which Dr. Dietrich recommended that the claimant "begin a rehabilitation program on his own and ...  return PRN" (Exhibit 4F).

The claimant saw his primary care physician in November 2010 for a reported sinus infection, at  which time his "back pain" and "knee pain" were again documented, as was the "chronic issue" of the claimant's "pain meds" -  including his use of another person's Darvon because he reportedly  "ripped a muscle in his back [while] throwing stones," and his increased use of Cymbalta "while [substitute teaching]" -  as the claimant had previously, in 2009, "traded Flexeril for Oxycontin  with a guy at work," at which time he was "cautioned re: appropriate/ inappropriate med use and not 'trading' meds" (Exhibit 17F).

In April 2011, the claimant had a Body Mass Index (BMI) just over 35 and, reporting that he had "trouble sleeping at times due to pain," the claimant requested "Ambien or something" (Exhibit 17F).  May 2011 finds the claimant gardening and reporting that he had been "swimming a lot over winter" (Exhibit 17F).  In January 2012, the claimant reported that he "fell off a ladder a few days ago and hurt [his] right knee"; he received a prescription for Vicodin, and when seen in follow-up on February 16, 2012, the claimant displayed a "normal range of motion in all joints" and normal affect, with good eye contact (Exhibit 17F).

Nevertheless, on March 16, 2012, the claimant presented to orthopedist Phillip  Lewandowski, M.D. for an evaluation of the "gradually progressive difficulties" with his right knee (Exhibit 4F).

4

Finding "palpable osteophytes and tenderness" and a mild flexion contracture with mild effusion, and noting x-ray evidence of moderate to severe tricompartmental arthritis in the claimant's right knee, Dr. Lewandowski recommended a series of viscosupplementation injections; following a series of 3 injections through May 2012, the claimant was not seen in specialized follow-up of his right knee until November 2016 (Exhibit 4F).

In the interim, July 2012 finds the claimant just returning from a vacation in Maine, where he reportedly "ate lobster everyday," resulting in a "gout attack" that was exacerbated by his having "jammed his big toe into a wall" (Exhibit 17F).  An x-ray of the claimant's toe disclosed degenerative changes but no evidence of fracture, and the claimant was advised regarding medication and diet for his "classic gouty flare" (Exhibit 17F).

The claimant's primary care complaint in March 2013 was of left shoulder pain, but x-rays obtained at that time showed only some "degenerative changes of the acromioclavicular articulation," and the claimant acknowledged at that time that he remained "able to swim" (Exhibit 17F).  Treatment of the claimant at that time consisted of "counseling" regarding his "multiple health issues, including but not limited to diet, exercise, sleep, stress reduction, [and] goal setting" (Exhibit 17F).

The claimant reported, in June 2013, left thumb soreness and discoloration, particularly when "playing softball with the kids," and although updated x-rays of the claimant's right knee demonstrated increased, "end-stage osteoarthritis" in July 2013, the claimant stated in October 2013, that "after a particularly vigorous period of activity, including reroofing a house," he had some right inguinal pain in the area of his prior hernias (Exhibits 3F, 4F, 17F).  The claimant noted at that time his histories of right knee pain and "chronic back pain," but he said that he was putting off right knee replacement "as long as possible," that he had no difficulty performing or completing routine daily living activities, and that he was "contemplating returning to school to complete an advanced degree" (Exhibit 3F).  The claimant did not report recently, in September 2013, beginning work as a grocery store stocker, and examination of the claimant revealed no evidence of hernia recurrence, nor any other findings of significance (Exhibit 3F).

In November 2013, the claimant sought chiropractor care for "lower thoracic, sacral, lumbar, left hip and right hip discomfort," that he rated as a "7," and that he said was "aggravated by heavy lifting at work" (Exhibit 1F).  His treatment note from that visit indicates that,

"Despite the presence of segmental movement irregularities," as well as lower lumbar and sacroiliac muscle spasms, the claimant's "global range of motion was within normal ranges" (Exhibit 1F). After 1 treatment, the claimant reported decreased pain, which he rated as a "2," as well as "increased movement and increased strength" (Exhibit lF).

In December 2013, the claimant again reported eating lobster and again complained of gouty toe pain (Exhibit 17F). The claimant left his stocking job in February 2014 due to complaints of increased pain, but in April 2014, the claimant reported doing some "heavy shoveling," also with complaints of increased pain (Exhibit 1F). July 2014, however, finds the claimant with a BMI under 30; he reported "eating better" and "exercising better" and "doing well," and he said that his "pain [was] controlled" (Exhibit 17F). Although the claimant began participating in a pain management program in early 2013, and remained in that program into 2015, the record contains no corresponding treatment notes.

According to the record, the claimant had an increase in his back pain after "lifting and pulling [his] dock for the winter," and although in January 2015 he had an increased BMI of 33, he said that he was still swimming and that he was "active with rental properties... on meds per pain management" (Exhibit 17F). June 2015 finds the claimant "working on [a] farm for the summer," with a "moderate flare up" of his pain, but following a chiropractic treatment, the claimant in July 2015 reported feeling "better," with a pain level of "4," until he began "lifting antiques" (Exhibit lF).

Inexplicably, the claimant returned to his primary care provider, Kristin Kranz, M.D. on August 6, 2015, complaining of "anger issues" because he was "frustrated with [his] inability to be active" (Exhibit 17F). The claimant further explained, however, that he was upset by his recent increase in pain, which caused him "to miss work" and seek ER treatment, after being "at a show recently, [where he was] moving around 100 pound statues" (Exhibit 17F).

In October 2015, the claimant "eating well but not healthfully" and he was again complaining of gouty pain while also noting that a re-start of his Zoloft was "work[ing] well" (Exhibit 17F). The claimant's complaint, in December 2015, was of a "tingling sensation in [his] hands" that was "getting worse" and interfering with his abilities to engage in "construction, landscaping, gardening, [and] substitute teaching," although he was still "working a lot at home"; he noted having significant "stress," but did not describe the nature of his stress, reporting only that his family was

6

"good" and that there was "little stress there" (Exhibit 17F).
Physical exam findings were unremarkable, so an MRI study of the
claimant's cervical spine was ordered (Exhibit 17F). The claimant
underwent a laparoscopic appendectomy in July 2016, at which time
a left inguinal hernia was observed but found not to require repair
(Exhibit 3F). By his report, the claimant was then working "with
handicapped children," and after surgery, the claimant "went out of
town on vacation" (Exhibit 3F).

On November 16, 2016, the claimant returned to Dr. Lewandowski,
reporting right knee pain that was "not tolerable anymore" but which
did not require "any devices for assistance" in standing or
ambulation (Exhibit 4F). Plain film studies obtained at that time
showed "severe erosive bone-on-bone osteoarthritis in all
compartments" of the claimant's right knee, with subchondral cysts
and sclerosis; a total right knee replacement was recommended and,
in January 2017, undertaken (Exhibits 4F, 15F).

The claimant "returned to driving" in March 2017, despite his
complaints of continued pain, and he was also "ambulating without
a device" in addition to completing all of his daily living activities
independently notwithstanding his back and right knee pain as well
as his left elbow bursitis, as noted by Dr. Dietrich in February 2017;
as of March 9, 2017, the claimant said that he was sleeping on the
first floor of his 2-story home because he could not easily go
upstairs, and he noted that he remained unable to ride bikes with his
daughters, swim, and lift weights (Exhibit 15F).

The claimant participated in 9 of 16 scheduled post-operative
physical therapy sessions through March 16, 2017, after which he
did not return, reporting that he had "chosen to get exercises off the
internet... despite" a recommendation that he not do so "until [those
exercises could] be further evaluated" by his therapist (Exhibit 17F).

During physical therapy, the claimant was observed to display a flat
affect, and while he received no specialized mental health care of
record through his March 30, 2017 date last insured, the claimant
reported feeling "very stressed" post-operatively, as he felt that he
was "not providing for his family," and on May 17, 2017, the
claimant was seen in for an initial psychological diagnostic intake
interview (Exhibit 8F). The claimant said that he was "worried" and
"overwhelmed" by "all of his physical health problems" in addition
to some marital difficulties, and he acknowledged "that he drinks
every night... to cope" with these stressors (Exhibit 8F). The
claimant said that he did not wish to address his alcohol use,
diagnosed as "mild abuse," at that time, but that he did want to deal

with his diagnosed depression and anxiety (Exhibit 8F). The claimant related that leaving in a few days for his family cottage in Maine, where he his family planned "to stay [for] a couple of weeks," would help in that regard, as he "talked about going for ice cream, catching lobsters, building huge sand castles, etc.... [and] about the joy he feels when spending time with his girls" (Exhibit 8F).

Upon his return, the claimant lamented feeling put upon by continued marital discord and by the way he had been treated "so poorly" regarding "the zoning of his house"; the claimant appeared "highly reactive" and had "great difficulty" staying focused, but he also acknowledged "that he [had] been overindulging in food and alcohol," and he acknowledged further overindulgence into early 2018, well beyond his date last insured (Exhibit 8F). Moreover, in April 2018, the claimant "brought with him" to counseling, "a file folder and [he] related the content as being evidence of his credentials," and he said that he simply could not "ascertain a reason why he cannot secure a job" (Exhibit 23F).

Physically, the claimant's right knee as of January 2018 was "in good position and stable" and he was scheduled to begin viscous left knee injections "in March" for his "advanced degenerative changes of the patellofemoral joint" (Exhibit 18F).

(ECF No. 12, PageID #: 83-87).

### C. Opinion Evidence at Issue

#### 1. Treating Source Opinions

##### i.    Mohan Kareti, M.D. – July 17, 2018

On July 17, 2018, Dr. Kareti submitted a medical source statement on behalf of Claimant. (ECF No. 12, PageID #: 1315-1318). At that time, he had been treating Claimant bi-weekly to monthly for over a year. Dr. Kareti opined that Claimant could walk less than one city block without rest or severe pain. He opined Claimant could sit for fifteen minutes at a time, stand for ten minutes at a time, and sit and stand/walk for less than two hours in an 8-hour workday. Dr. Kareti opined that Claimant required a job that allowed him to shift positions at will and would need to take unscheduled breaks lasting 15-30 minutes every two hours during the workday. Dr.

Kareti opined that Claimant would need to elevate his legs 50% of the time due to swelling and pain but that he did not require the use of a cane or other assistive device. Dr. Kareti opined that Claimant could occasionally lift up to twenty pounds, occasionally twist and climb stairs, and rarely stoop, crouch, squat, or climb ladders. Dr. Kareti opined that Claimant's hands, finger, and arms were severely limited. He stated that Claimant would be off task more than 25% of the time and was incapable of even "low stress" work. Finally, Dr. Kareti opined that Claimant's impairments would cause him to be absent from work more than four days each month.

The ALJ did not specifically assign a weight to Dr. Kareti's opinion. (*See* ECF No. 12, PageID #: 87).

### ii. Phillip Lewandowski, M.D. – July 6, 2018

On July 6, 2018, Dr. Lewandowski completed a medial source statement asserting that Claimant would be undergoing surgical intervention on November 27, 2018 and would be under "full restrictions," including no lifting, bending, pushing, pulling, twisting or driving for up to twelve weeks post operation. (ECF No. 12, PageID #: 1267).

The ALJ gave "weight" to Dr. Lewandowski's opinion. (*See* ECF No. 12, PageID #: 87).

### iii. Todd Ivan, M.D. – July 6, 2018

On July 6, 2018, Dr. Ivan completed a medical source statement on behalf of Claimant who was treating with Dr. Ivan for his bipolar disorder. (ECF No. 12, PageID #: 661-663). Dr. Ivan opined that Claimant was "unable to meet competitive standards" in his abilities to: carry out detailed instructions; maintain attention and concentration for extended periods; manage regular attendance and be punctual within ordinary tolerances; sustain ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based

9

symptoms; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. He opined Claimant would be "seriously limited, but not precluded" in his abilities to: carry out very short and simple instructions; perform activities within a schedule; perform at a consistent pace without an unreasonable number or length of rest periods; understand and remember detailed instructions; and be aware of normal hazards and take appropriate precautions. Dr. Ivan opined that Claimant's mental impairments would cause him to be absent fifteen or more days per month and be off task up to six hours a day.

The ALJ gave Dr. Ivan's opinion little weight stating that his opinion "lack[ed] support in [his] own treatment records or in the record evidence as a whole, and because [he] did not treat the claimant during the period at issue[.]" (ECF No. 12, PageID #: 87).

### iv.    Kristin Kranz, M.D. – July 18, 2018

Dr. Kranz was Claimant's primary care physician and had treated him since 1993 for depression, ortho pain, internal issues, respiratory issues, and digestive issues. On July 18, 2018, Dr. Kranz completed a medical source statement. (ECF No. 12, PageID #: 1346-1349). Dr. Kranz opined that Claimant's concussions, depression, anxiety, personality disorder, and psychological factors affecting physical conditions impacted his problems. She opined that Claimant could walk one block, sit for five minutes, and stand for five minutes at a time. In an 8-hour workday, he could sit/stand/walk for less than two hours each. Dr. Kranz opined that Claimant would need to shift positions at will and take unscheduled breaks due to muscle weakness, chronic fatigue, pain, and adverse effects of medication. He would need to elevate his legs 50 to 60% of a workday, and

would need a cane for imbalance, pain, weakness, and instability. He could rarely lift up to ten pounds, rarely twist, stoop, and climb stairs, but never crouch, squat or climb ladders. Based on his severe carpal tunnel, he would be limited in the use of his hands for grasping, fingering, and reaching. Dr. Kranz opined that Claimant would be off task more than 25% of a day, was incapable of even "low stress" work, and would miss more than four days of work per month. Dr. Kranz opined that Claimant had profound hearing and vision loss.

The ALJ did not consider Dr. Kranz's opinion because it was submitted untimely. (ECF No. 12, PageID #: 87). However, the Appeals Council considered the opinion and gave it "little weight." (ECF No. 12, PageID #: 64).

### v.    Paul G. Monkowski, Ph.D. – July 16, 2018

On July 16, 2018, Dr. Monkowski completed a mental impairment questionnaire. (ECF No. 12, PageID #: 1344-1345). Dr. Monkowski opined that Claimant had major depression that was moderate and recurrent. He also stated that Claimant's impairment has lasted or could last at least twelve months but did not complete the limitations portion of the questionnaire and refused to opine on Claimant's likelihood of missing work or being off task due to his mental impairments stating that he had only treated Claimant one time as of the date of the questionnaire.

The ALJ did not consider Dr. Monkowski's opinion stating that the statement was submitted untimely. (ECF No. 12, PageID #: 87).

The Appeals Council reviewed the statement and stated that Dr. Monkowski's opinion that Claimant had major depression that was moderate and recurrent was consistent with the evidence of record, but nonetheless gave the opinion "no weight" as the Claimant's only treatment with Dr. Monkowski had been after the date of last insured. (ECF No. 12, PageID #: 64).

### vi.    Kim Kahelin, Licensed Professional Clinical Counselor, ("LPCC") – July 5, 2018

On July 5, 2018, Kahelin completed a mental impairment questionnaire on behalf of Claimant who had treated with Kahelin for ten sessions between May 17, 2017 and March 1, 2018. (ECF No. 12, PageID #: 659-661). Kahelin opined that Claimant had "no useful ability to function" in his abilities to: complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without unreasonable rest periods. She opined that Claimant would be "unable to meet competitive standards" in his ability to: maintain attention and concentration for extended periods; manage regular attendance and be punctual within ordinary tolerances; sustain ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; understand and remember detailed instructions; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards to of neatness and cleanliness; respond appropriately to changes in the work setting; and be aware of normal hazards and take appropriate precautions. Kahelin opined that Claimant was "seriously limited, but not precluded" in his ability to: carry out detailed instructions; perform activities within a schedule; ask simple questions or request assistance; and set realistic goals or make plans independently of others. Kahelin opined that Claimant would be absent from work 20-23 out of 30 days a month and would be off task 75% of an 8-hour workday.

The ALJ gave Kahelin's opinion little weight explaining that her opinion "lack[ed] support in [her] own treatment records or in the record evidence as a whole, and because [she] did not treat the claimant during the period at issue[.]" (ECF No. 12, PageID #: 87).

## 2. State Agency Reviewing Physicians

State Agency reviewing physician Maureen Gallagher, D.O., M.P.H. reviewed Claimant's

records and provided an opinion as to his physical RFC on February 6, 2017. The assessment was for a date of last insured of September 30, 2015. (ECF No. 12, Page ID #: 142). Dr. Gallagher opined that Claimant could perform work at a light exertional level and was further limited to frequent use of right lower extremity; could never climb ladders; frequent balancing and stooping; occasional kneeling, crouching, crawling, and stairs; and no concentrated exposure to hazards.

On April 19, 2017, Leon D. Hughes, M.D. completed an assessment of Claimant's physical RFC upon reconsideration. Dr. Hughes's findings were the same as those of Dr. Gallagher.

The ALJ stated: "These opinions are consistent with the totality of the evidence, including the claimant's essentially uninterrupted history of work through the date last insured. I have accorded these opinions weight[.]" (ECF No. 12, PageID #: 87).

On February 2, 2017, Cindy Matyi, Ph.D. completed a psychiatric review technique assessment of Claimant's records and stated: "[Claimant] alleges depression, and the data we have establishing chronic pain makes this a high possibility. However, no records addressing mental health are available for the relevant time period. Insufficient evidence to evaluate disability." (ECF No. 12, PageID #:140). Dr. Matyi analyzed Claimant's records using a date of last insured of September 30, 2015. (ECF No. 12, PageID #:140).

Upon reconsideration, Jaime Lai Psy.D. reviewed the records, again using a date of last insured of September 30, 2015. (ECF No. 12, PageID #: 147, 151). Dr. Lai performed a psychiatric review technique assessment and on April 17, 2017 her findings echoed those of Dr. Matyi. (ECF No. 12, PageID #: 152).

## IV.    The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

2.    The claimant did not engage in substantial gainful activity during the period from his alleged onset date of January 15, 2010 through his date last insured of March 31, 2017 (20 CFR  404.1571 et seq.).

3.    Through the date last insured, the claimant had the following severe impairments: Obesity; recurrent inguinal hernia, status post multiple repairs; generalized osteoarthritis, status post multiple fractures, and degenerative joint disease of the bilateral knees, status post right knee replacement; cervical degenerative disc disease; and bipolar, depressive, and anxiety disorders, with a history of alcohol dependence (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or a combination of impairments that met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    Through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), except that he could not climb ropes, ladders, or scaffolds, and he was required to avoid concentrated exposure to unprotected heights, moving mechanical parts, and the operation of motor vehicles. The claimant could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl, and he could perform simple routine tasks at a nonproduction rate pace.

10.   Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

## V. Law & Analysis

### A.  Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529

15

(6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

### C. Discussion

Claimant raises one issue on appeal. However, within that single issue, Schmitt raises several sub-issues: 1) Whether the ALJ and/or the Appeals Councill gave proper weight to the medical opinions; 2) whether the ALJ properly assessed Claimant's obesity in combination with his other impairments; and 3) whether the ALJ properly assessed whether Claimant met a listing. The Court agrees that the Appeals Council failed give good reasons for giving little weight to the treating source opinion of Dr. Kranz and that the error was not harmless. Because remand is necessary, the Court will not address the remaining issues raised by Claimant.

Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c). [1] As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), *id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"), *id.* § 404.1502, 404.1527(c)(2). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

---

[1] The regulations for handling treating source evidence have been revised for claims filed after March 27, 2017. See 20 C.F.R. § 416.927. Plaintiff filed his claim before the revision took effect.

The source of the opinion therefore dictates the process by which the Commissioner accords it weight.

Schmitt argues that the Appeals Council erred by giving less than controlling weight to the opinion of his treating physician, Dr. Kristin Kranz.

### 1. Treating Source Rule

Under the treating source rule, an ALJ "must" give a treating source opinion controlling weight if the treating source opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Blakley* v. *Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2) (eff. to July 31, 2006)[3])). "It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent the with other substantial evidence in the case record." SSR 96–2p, 1996 WL 374188, at *2 (July 2, 1996).

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544); *see also* 20 C.F.R. § 404.1527(c)(2) (eff. Aug. 24, 2012). "In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned." *Cole v. Astrue*, 661 F.3d 931, 938 (2011); § 404.1527(c)(2). "These reasons must be

'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting SSR No. 96–2p, 1996 WL 374188, at *5). "This procedural requirement 'ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.'" *Id.* (quoting *Wilson*, 378 F.3d at 544). The ultimate question is whether the Commissioner's decision is supported by substantial evidence and whether it was made pursuant to proper legal standards. *Cole*, 661 F.3d at 939.

### 2. Analysis

Dr. Kranz completed a medical source statement for Claimant on July 18, 2018. (ECF No. 12, PageID #: 1349-1349). Dr. Kranz treated Claimant as his primary care physician for roughly 25 years at the time she issued her opinion. Dr. Kranz opined that Claimant could walk one block, sit for five minutes, and stand for five minutes at a time. She opined that during an eight-hour workday, Claimant could sit, stand, and walk for less than two hours each. Dr. Kranz opined that Claimant would need to shift positions at will and take unscheduled breaks due to muscle weakness, chronic fatigue, pain, and adverse effects of medication. Dr. Kranz opined that Claimant would need to elevate his legs 50 to 60% of a workday, and would need a cane for imbalance, pain, weakness, and instability. He could rarely lift up to ten pounds, rarely twist, stoop, and climb stairs, but never crouch, squat or climb ladders. Based on Claimant's severe carpal tunnel, Dr. Kranz opined that Claimant would be severely limited in the use of his hands for grasping, fingering, and reaching. Dr. Kranz opined that Claimant would be off task more than 25% of a day, was incapable of even "low stress" work, and would miss more than four days of work per month. Dr. Kranz opined that Claimant had profound hearing and vision loss. Dr. Kranz opined that Claimant's

concussions, depression, anxiety, personality disorder, and psychological factors affecting physical conditions contributed to the severity of Claimant's limitations.

The ALJ did not consider Dr. Kranz opinions stating that the statement was submitted untimely. (ECF No. 12, PageID #: 87). However, because the ALJ marked the opinion as an exhibit, the Appeals Council found the ALJ had failed to fully support the decision pursuant to HALLEX I-2-6-59C, which discuss an ALJ's duty regarding untimely submitted evidence. (ECF No. 12, PageID #: 64). After reviewing the Dr. Kranz's opinion, the Appeals Council gave it "little weight" and explained:

> Dr. Kristin Kranz's physical medical source statement (Exhibit 25F), a treating source since 1993 (Exhibit 7F), is a patient report and preliminary intake statement with very little opinion evidence from Dr. Kranz. The evidence of record from Dr. Kranz consists of basic treatment notes (Exhibit 17F). Dr. Kranz opined that the claimant had profound hearing and vision loss, would be off task 25% of the time, had pain in joints due to fractures, arthritis, Irritable Bowel Syndrome, shingles, and gout (Exhibit 25F). However, the opinion that the claimant would be off task 25% is not supported anywhere else in the record, nor is the opinion that the claimant had profound hearing and vision loss. Due to the lack of corroborating evidence, the Appeals Council gives little weight to this opinion.

(ECF No. 12, PageID #: 64).

### a. The Appeals Council Failed to Give Good Reasons for Giving "Little Weight" to a Treating Source Opinion.

A medical opinion from a treating source must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. *Gayheart*, 710 F.3d at 376. If it is not given controlling weight, "the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the

opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2)).

Here, the Appeals Council gave less than controlling weight to Dr. Kranz's opinion because it found that the opinion was inconsistent with the evidence in the record. (ECF No. 12, PageID #: 64 ("Due to the lack of corroborating evidence, the Appeals Council gives little weight to this opinion.")). However, "'a finding that a treating source medical opinion ... is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected.'" *Blakley*, 581 F.3d at 408 (quoting SSR 96–2p, 1996 WL 374188, at *4). "'Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927.'" *Id*.

When an ALJ chooses not to ascribe controlling weight to a treating source's opinions, the ALJ must show his work by analyzing factors set forth in *Wilson*. These factors include: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source[.]" *Wilson*, 378 F.3d at 544. "[T]he regulation also contains a clear procedural requirement: 'We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). Pursuant to SSR 96-2p, "a decision denying benefits 'must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and

the reasons for that weight.'" *Id.* (quoting SSR 96-2p, 1996 WL 374188, at *5 (1996)).

Here, the Appeals Council addressed the *Wilson* factors when it gave Dr. Kranz's opinion "little weight". The council recognized the length and nature of Dr. Kranz's treating relationship with Claimant. The council also referenced the consistency of the opinion with the record as a whole and the supportability of the opinion with the records.

However, the Appeals Council failed to give good reasons for giving Dr. Kranz's opinion "little weight" as the council's discussion was not "sufficiently specific" for this Court to follow the reasons given for the weight given. The Appeals Council discussed only a few of Dr. Kranz's opinions, specifically, that Claimant would be off task 25% of the time and that he had "profound hearing and vision loss". The council, however, never mentioned several of Dr. Kranz's opinions including that Claimant could walk one block, sit for five minutes, and stand for five minutes; sit/stand/walk for less than two hours each in an eight-hour workday; he would need to shift positions at will and take unscheduled breaks; he would need to elevate his legs 50 to 60% of a workday; he would need a cane for imbalance, pain, weakness, and instability; he could lift less than ten pounds rarely; he could rarely twist, stoop, and climb stairs; and he would be severely limited in the use of his hands for grasping, fingering, and reaching. The government argues that by adopting the ALJ's discussion of the medical evidence, the Appeals Council's explanation that there was a lack of corroborating evidence applies to all of Dr. Kranz's opinions. However, when an ALJ, or here the Appeals Council, rejects the opinions of a treating physician, he must sufficiently explain the reasons for rejecting the opinion. *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) ("[I]t is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of

21

the stick."). The Appeals Council did not do that here. Instead, it provided an ambiguous single

line explanation that does not sufficiently address the numerous opinions provided by Dr. Kranz.

As in *Shields v. Comm'r of Soc. Sec.*, 732 F. App'x 430 (6th Cir. 2018),

> Reversal is required ... because the ALJ failed to follow the treating-
> source regulation. It is undeniable that [Dr. Kranz] was one of
> [Claimant]'s treating physicians.... It is also uncontested that [Dr.
> Kranz] treated [Claimant] during the period that [he] alleges being
> disabled. [Dr. Kranz's] opinion therefore should have been accorded
> controlling weight absent (1) sufficiently specific reasons for
> discounting it and (2) a precise explanation of how those reasons
> lead to that conclusion. *Rogers*, 486 F.3d at 243. Moreover, even
> were such a conclusion properly reached, [Dr. Kranz's] opinion was
> "still entitled to deference and [ought to have] be[en] weighed using
> *all* of the factors provided in 20 [C.F.R. §§] 404.1527 and
> 416.927[,]" i.e., the *Wilson* factors. Soc. Sec. Rul. 96-2p, 1996 WL
> 374188, at *4 (emphasis added).

*Shields*, 732 F. App'x at, 438.

### b.    The Agency's Failure to Give Good Reasons Was Not Excusable Harmless Error

"[W]here the ALJ fails to give good reasons on the record for according less than

controlling weight to treating sources, we reverse and remand unless the error is a harmless de

minimis procedural violation." *Blakley*, 581 F.3d at 409 (citing *Wilson*, 378 F.3d at 547). "Such

harmless error may include the instance where 'a treating source's opinion is so patently deficient

that the Commissioner could not possibly credit it,' or where the Commissioner 'has met the goal

of ... the procedural safeguard of reasons.'" *Id.*; *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x

435, 440 (6th Cir. 2010) ("Violation of the rule constitutes harmless error if the ALJ has met the

goals of the procedural requirement—to ensure adequacy of review and to permit the claimant to

understand the disposition of his case—even though he failed to comply with the regulation's

terms."). The ALJ can meet these goals by "indirectly attacking the supportability of the treating

physician's opinion or its consistency with other evidence in the record." *Coldiron*, 391 F. App'x

at 440). "However, the ALJ's failure to follow the Agency's procedural rule does not qualify as harmless error where we cannot engage in 'meaningful review' of the ALJ's decision." *Id*. (citing *Wilson*, 378 F.3d at 544).

Here, the Appeals Council's failure to provide good reasons for giving Dr. Kranz's opinion little weight is not an excusable de minimis procedural violation. First, this Court cannot engage in meaningful review of the Appeals Council's decision because its reasoning is not "sufficiently specific to make clear" (SSR 96–2p, 1996 WL 374188, at *5) that the council recognized and evaluated the extensive opinions of Dr. Kranz.

Second, the ALJ's decision does not indirectly attack Dr. Kranz's opinions regarding Claimant's ability to lift less than ten pounds rarely; walk one block, sit for five minutes, and stand for five minutes; sit/stand/walk for less than two hours each in an eight-hour workday; the need to elevate his legs 50 to 60% of a workday; rarely twist, stoop, and climb stairs; and be severely limited in the use of his hands for grasping, fingering, and reaching. For example, Dr. Kareti similarly opined that Claimant could walk less than one block, sit for fifteen minutes, stand for ten minutes, sit/stand/walk each for less than two hours in an eight-hour workday, would need to elevate his legs 50% of the workday, could occasionally lift up to twenty pounds; and had significant limitations in reaching, handling, and fingering. (ECF No. 12, PageID #: 1316-1317). The ALJ discounted Dr. Kareti's opinion because he did not treat Claimant during the relevant period and because the imaging studies Dr. Kareti cited post-date the Claimant's date last insured and because they "show no more than mild to moderate arthritic changes." (ECF No. 12, PageID #: 87). Because Dr. Kareti's opinion was discounted due to the treating relationship not having been established until after the relevant period, the ALJ's analysis does not indirectly attack Dr. Kranz's opinions, which clearly relate to the relevant period. Additionally, one imaging study

referred to by the ALJ indicating mild degenerative changes relates to Claimant's low back, not his knees or hands. (*See* ECF No. 12, PageID #: 1315). The MRI of Claimant's knee, however, was noted to show "multiple pathologies" (ECF No. 12, PageID #: 1315) including *advanced* patellofemoral osteoarthritis with degeneration of the meniscus (ECF No. 12, PageID #:763; *see also* PageID #: 762). The ALJ's analysis of Dr. Kareti's opinion was silent as to the remaining functional limitations, which were substantially similar to those of Dr. Kranz. Thus, the ALJ's analysis of Dr. Kareti's opinions is not an indirect attack of Dr. Kranz's opinions.

Additionally, the ALJ's analysis of the State Agency physician's opinions does not indirectly attack Dr. Kranz's opinions because those opinions failed to consider any evidence of Claimant's impairments after September 30, 2015. Evidence not considered by the reviewing physicians included an x-ray of Claimant's right knee dated November 16, 2016, which indicated severe erosive bone-on-bone osteoarthritis in all compartments with a valgus deformity and cysts along with sclerosis. (ECF No. 12, PageID #: 497). Claimant then had his right knee replaced on January 12, 2017. (ECF No. 12, PageID #: 665). On March 22, 2017, Claimant complained of pain in his left knee. (ECF No. 12, PageID #: 722). X-rays of Claimant's left knee were performed, and Claimant was diagnosed with "patellar tendonitis" and advised to use stretching and strengthening exercises for his quads. (ECF No. 12, PageID #: 728). Shortly after his date last insured, an MRI of the left knee revealed mild meniscal degeneration, mild tendinopathy, small knee joint effusion, and advanced patellofemoral articular cartilage loss with significant osteoarthropathy. (ECF No. 12, PageID #: 761-762).

In addition to his knee problems, Claimant also treated on March 22, 2017 for a ganglion cyst, radial collateral ligament sprain in right thumb, right carpal tunnel syndrome, trigger finger of right hand, and ulnar neuropathy of right upper extremity. (ECF No. 12, PageID #: 734; *see also*

ECF No. 12, PageID #: 982 (Complaining on December 12, 2015 of hand pain occurring for several months)). He received injection therapy including cortisone to treat his right hand issues. (ECF No. 12, PageID #: 745). An EMG on April 18, 2017 – after Claimant's date of last insured – demonstrated right mild carpal tunnel syndrome. (ECF No. 12, PageID #: 743). Dr. Kranz considered these additional records and complaints when providing her opinion, whereas the reviewing physicians did not. Accordingly, the ALJ's discussion of the State Agency reviewing physicians' opinions does not indirectly attack Dr. Kranz's opinions.

Moreover, the decision as a whole does not indirectly attack Dr. Kranz's opinions. For example, although the ALJ mentions the existence of Claimant's carpal tunnel at Step Two, he does not analyze it in relation to any potential work-related restrictions.[2] Similarly, although the decision mentions injuries that Claimant sustained while lifting objects, the ALJ does not address how this affected the analysis of the RFC. Generally, the decision contains a recitation of the factual background of Claimant's injuries and complaints without engaging in any analysis as to how those injuries or complaints affected the RFC.

Third, Dr. Kranz's opined limitations were not otherwise accounted for in the RFC. The ALJ determined that Claimant could perform light work with the following additional limitations: "he could not climb ropes, ladders, or scaffolds, and he was required to avoid concentrated exposure to unprotected heights, moving mechanical parts, and the operation of motor vehicles.

---

[2] The ALJ found that Claimant's carpal tunnel was not a "severe impairment." (ECF No. 12, PageID #: 80). However, "'an ALJ's conclusion that an impairment is non-severe is not tantamount to a conclusion that the same impairment . . . does not impose *any* work-related restrictions.'" *Kochenour v. Comm'r of Soc. Sec. Admin.,* No. 3:14-CV-2451, 2015 WL 9258609, at *6 (N.D. Ohio Dec. 18, 2015) (quotation marks omitted) *(quoting Patterson v. Colvin,* No. 5:14-cv-1470, 2015 WL 5560121, *4 (N.D. Ohio Sept. 21, 2015) (quoting *Katona v. Comm'r of Soc. Sec.,* No. 14-cv-10417, 2015 WL 871617, *6 (E.D. Mich. Feb. 27, 2015) (citing 20 C.F.R. 404.1521(a))).

The claimant could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl, and he could perform simple routine tasks at a nonproduction rate pace." (ECF No. 12, PageID #: 82). "Light work" is defined as involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b). Additionally, "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping." SSR 83-10, 1983 WL 31251. The RFC does not include Dr. Kranz's opined limitations regarding Claimant's ability to lift less than ten pounds rarely, walk one block, sit for five minutes, and stand for five minutes; sit/stand/walk for less than two hours each in an eight-hour workday; the need to elevate his legs 50 to 60% of a workday; rarely twist, stoop, and climb stairs; and be significantly limited in the use of his hands for grasping, fingering, and reaching.

Fourth, there is no evidence in the record that Dr. Kranz's opinion is "so patently deficient that the Commissioner could not possibly credit it." *Wilson*, 378 F.3d at 547.[3] To the contrary,

---

[3] For example, despite the government's assertion, evidence in the record may support Dr. Kranz's opinion that Claimant suffered hearing loss. (*See* ECF No. 12, PageID #: 989-990 (Claimant complained of ringing in both ears, which was diagnosed as tinnitus. Medical records also note middle ear effusion in both ears, left ear has foreign body and impacted cerumen)). "In many cases tinnitus may be 'associated with' hearing loss because the same acoustic trauma may cause both conditions." *Webb v. Shulkin*, No. 16-1262, 2017 WL 1193632, at *3 (Vet. App. Mar. 31, 2017); *see also Tinnitus*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/tinnitus/symptoms-causes/syc-20350156 (last visited October 12, 2021).

Claimant's numerous x-rays and MRIs present objective findings that are, at the very least, not inconsistent with his treating physician's opinion.

Fifth, even if this Court agreed that substantial evidence supports the Appeals Council's weighing of Dr. Kranz's opinion, "substantial evidence alone does not excuse non-compliance with 20 C.F.R. § 404.1527(d)(2) as harmless error." *Blakley*, 581 F.3d at 409–10 (citing *Wilson*, 378 F.3d at 546 ("[T]o recognize substantial evidence as a defense to non-compliance with § 1527(d)(2)[ ] would afford the Commissioner the ability [to] violate the regulation with impunity and render the protections promised therein illusory. The general administrative law rule, after all, is for a reviewing court, in addition to whatever substantive factual or legal review is appropriate, to 'set aside agency action ... found to be ... without observance of procedure required by law.'" (quoting Administrative Procedure Act, 5 U.S.C. § 706(2)(D)(2001)))). Failure to identify reasons for discounting the opinion of a treating physician "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243. The ALJ was required to discuss his decision to discount Dr. Kranz's opinion and "relying on other information in the record to explain the omission would result in the Court engaging in post hoc rationalization, which is prohibited." *Miller v. Comm'r of Soc. Sec.*, No. 1:13-CV-1872, 2014 WL 3950912, at *13 (N.D. Ohio Aug. 12, 2014) (citing *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 192 (6th Cir. 2009); *Martinez v. Comm'r of Soc. Sec.*, 692 F. Supp. 2d 822, 826 (N.D. Ohio 2010)).

And finally, Dr. Kranz's opined limitations could have affected the disability determination. Dr. Kranz's functional limitations would have limited Claimant to sedentary exertional level. At the sedentary level of exertion, the Grids would have provided for a finding of disabled as of Claimant's 50th birthday – January 10, 2015. (ECF No. 14 at 14; 20 C.F.R. 404

Appendix 2 of Subpart P, Rule 202.12).

Here, the Commissioner failed to follow the applicable procedural requirements in reaching its disability determination, which precludes meaningful review. The Court finds that the Appeals Council failed to give good reasons for giving Dr. Kranz's opinion "little weight" and that this error was not harmless.

Accordingly, the Court recommends remand.

Because the Court finds that remand for further proceedings is necessary, the Court expresses no opinion on the remaining issues.

## VI. Recommendation

In conclusion, the Appeals Council's analysis of Claimant's treating physician opinion from Dr. Kranz prevents this Court from finding that the Commissioner's decision is supported by substantial evidence. Accordingly, the Court recommends that the District Court REMAND the matter to the Commissioner for further proceedings.

 Dated: October 15, 2021

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F. 3d 520, 530-31 (6th Cir. 2019).